DEPARTMENT OF ENERGY and Donald Paul Hodel, Secretary of Energy, Defendants-Appellants,

v.

Ray L. HUNT, Independent Executor of the Estate of H.L. Hunt, Plaintiff-Appellee,

The States of Arkansas, Connecticut, Delaware, Hawaii, Indiana, Iowa, Kansas, Louisiana, Minnesota, Nevada, New Mexico, North Carolina, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, Utah, Vermont, Virginia, West Virginia, Wisconsin, and Wyoming, the Territory of Guam and the Virgin Islands, Intervenors-Appellants,

Cities Service Company, Intervenor-Appellee.

Nos. 5–101, 5–102.

Temporary Emergency Court of Appeals.

Argued Jan. 17, 1985.

Decided July 16, 1986.

Rehearing and Rehearing En Banc Denied Aug. 26, 1986.

Thomas C. Newkirk, with whom Larry P. Ellsworth, David A. Engels, and Marcia K. Sowles, Dept. of Energy, Washington, D.C., were on brief, for defendants-appellants.

Edward G. Modell, with whom Bernard Nash, Blum, Nash and Railsback, Thomas W. Mack and Andrew P. Miller, Dickstein, Shapiro and Morin, James F. Flug, Lobel, Novins and Lamont, Washington, D.C., Hubert H. Humphrey, III, Atty. Gen., St. Paul, Minn., Paul Bardacke, Atty. Gen., Santa Fe, N.M., David Frohnmayer, Atty. Gen., Salem, Or., and Gerald L. Baliles, Atty. Gen., Richmond, Va., were on brief for intervenors-appellants States.

Philip P. Kalodner, Attorney for National Freight, Inc., RJG Cab Co., and Geraldine H. Sweeney, Philadelphia, Pa., Harold E. Kohn and Joseph C. Kohn, Kohn, Savett, Marion and Graf, P.C., Attorneys for Philadelphia Elec. Co., were on brief, for *amici curiae.*

Brett A. Ringle, with whom Karen S. Bedell, Shank, Irwin and Conant, Dallas, Tex., were on brief, for plaintiff-appellee, Ray L. Hunt.

John M. Simpson, with whom Keith A. Jones, James F. Moriarty, Fulbright and Jaworski, Washington, D.C., and Darrel A. Kelsey and Gerald H. Barnes, Cities Service Oil and Gas Corp., Tulsa, Okl., were on brief, for intervenor-appellee, Cities Services Co.

Before BECKER,* DAUGHERTY and THORNBERRY, Judges.

THORNBERRY, Judge:

This appeal presents a narrow issue: whether the district court abused its discretion in holding that the Department of Energy (DOE) failed to demonstrate a change in core circumstances requiring remand of a lawful remedial order to the agency for reconsideration. We are not asked to determine the district court's power or duty to fashion a restitutionary remedy. *Compare United States v. Exxon Corp.,* 773 F.2d 1240, 1280–87 (Temp.Emer.Ct.App. 1985); *Citronelle-Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 723 (Temp.Emer. Ct.App.), *cert. denied,* 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). Because we find that the district court did not abuse its discretion in denying DOE's motion to remand, we affirm its order.

## I. INTRODUCTION

DOE issued the remedial order with which we are concerned in November 1977. The order required the Estate of H.L. Hunt (Hunt) to refund crude oil overcharges of $316,960.91 plus interest to Cities Service Co. (Cities Service), the first purchaser from Hunt. After exhausting its administrative remedies, Hunt filed suit in federal district court for the Northern District of Texas, seeking judicial review of the stripper well regulation on which the remedial order was based, DOE's interpretation of the regulation in Rulings 1974–29 and 1975–12, and the remedial order itself. In 1979 the district court issued a preliminary injunction restraining DOE from enforcing the stripper well regulation against Hunt. At the same time, the court ordered Hunt to pay an amount equal to the alleged overcharges into an interest-bearing escrow account.

---

* Judge Becker filed a dissenting opinion.

This Court upheld the stripper well regulation in 1982. *In re Department of Energy Stripper Well Exemption Litigation*, 690 F.2d 1375 (Temp.Emer.Ct.App.1982), *cert. denied*, 459 U.S. 1127, 103 S.Ct. 763, 74 L.Ed.2d 978 (1983). Soon afterward DOE filed a motion for summary judgment and for remand of the part of the remedial order that required Hunt to refund the overcharges to Cities Service. DOE sought the remand on grounds that the decontrol of oil prices in 1981 constituted a change in circumstances that undermined the agency's purpose in ordering the refund. The district court granted DOE's summary judgment motion, *Prosper Energy Corp. v. Department of Energy*, 549 F.Supp. 300 (N.D.Tex.1982), but subsequently denied its motion for partial remand. DOE and the intervenor States[1] appeal the district court's order denying partial remand.[2]

■ This Court's review of the district court's order is limited. The decision whether to grant an agency's motion to remand for changed circumstances is committed to the sound discretion of the court hearing the motion. *Cf. Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 171–72, 83 S.Ct. 239, 247–48, 9 L.Ed.2d 207 (1962) (finding that district court, "in the exercise of its sound discretion," should have remanded order to agency in light of charged circumstances). Thus, this Court may reverse a district court's order denying a motion to remand only if we find that the district court has abused its discretion.

## II. CHANGE IN CIRCUMSTANCES

DOE relies on a line of cases that favor remand "where there has been a change in circumstances, subsequent to administrative decision and prior to court decision, that is not merely 'material' but rises to the level of a change in 'core' circumstances, the kind of change that goes to the very heart of the case." *Greater Boston Television Corp. v. Federal Communications Commission*, 463 F.2d 268, 283 (D.C.Cir. 1971), *cert. denied*, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972). DOE argues that decontrol of the oil industry in 1981 changed the "core circumstances" in this case. Before decontrol, a first purchaser-refiner such as Cities Service, upon receiving a refund from its crude oil supplier, would have been required either to reduce its maximum lawful selling price or to draw upon its "bank" of unrecouped costs.[3] In either case, the refiner might have been forced to lower the price it charged its

---

1. DOE and the intervenor States make similar arguments on appeal, and we refer to them collectively as "DOE." Similarly, we refer to appellees Cities Service and Hunt as "Cities Service."

2. The intervenor States also appeal the district court's order denying the States' motion for reconsideration of the order denying remand. The States argue that the district court should have granted their motion for reconsideration because the court's order denying remand was inconsistent with its decision in *Christmann & Welborn v. DOE*, 4 Energy Mgmt. (CCH) ¶ 26,-467 (N.D.Tex. Dec. 20, 1982), in which it remanded a remedial order to DOE "for consideration of the appropriate remedy in light of decontrol." But as the district court pointed out in the unpublished opinion accompanying its order denying the motion for reconsideration, factual differences between *Christmann* and this case explain the apparently inconsistent results. In *Christmann*, the amount of the refund was uncertain and could best be calculated on remand, while in this case the amount of the

refund owed by Hunt is established. Moreover, the escrow agreement in *Christmann* provided that DOE would control the disbursement of escrowed funds, while in this case the DOE has no part in the disbursement of funds. In light of these differences, we find no inconsistency in the district court's decision in *Christmann* and its decision in this case.

3. A refiner's maximum lawful selling price under price controls was computed by adding its May 15, 1973 price to certain increased costs since that time. 10 C.F.R. § 212.83 (1981). When market conditions prevented the refiner from charging the maximum lawful price, the refiner was permitted to "bank" the unrecouped costs. These banked costs could be used under certain circumstances to increase the refiner's maximum lawful price when market conditions later improved. *Id.* Because the refund from Hunt would have represented a decrease in Cities Service's costs, it would have forced Cities Service either to lower its maximum selling price or to draw upon its bank of unrecouped increased costs from previous months.

customers for refined products. Ultimately, DOE contends, this price reduction would have been passed through the marketing chain to the consumer. In this manner the refund would have found its way to those who bore the brunt of the overcharge. After decontrol, by contrast, the first purchaser-refiner can simply pocket any refund it receives for overcharges; no pass-through is required.[4]

Cities Service offers two principal counterarguments. First, it notes that by early 1979 DOE had exempted from price controls between fifty and sixty percent of all refined products by volume. Refiners were not required to pass through cost reductions properly allocated to these products. Second, the price regulations established a *maximum* lawful selling price. According to Cities Service, market conditions held the *actual* selling prices below the maximum price throughout the period between issuance of the remedial order and decontrol. Consequently, had Cities Service received the refund before decontrol, its maximum lawful selling price would have decreased slightly, but its actual selling price would not have changed. At most, Cities Service argues, its bank of unrecouped costs would have shrunk somewhat, a matter of little significance given the small amount of the refund. Thus, Cities Service's use of the refund before

decontrol would have been no more limited as a practical matter than its use after decontrol; in neither case would the refund have been passed through for the consumer's benefit.

■ DOE has not attempted to disprove Cities Service's contentions, either before this Court or before the district court. Instead, it argues that the accuracy of those contentions should be determined in the first instance by DOE on remand.[5] In effect, therefore, the agency asserts not that a change in core circumstances justifies remand in this case, but that remand is necessary to determine whether core circumstances have changed. This view reflects a fundamental misunderstanding. As proponent of the remand motion, DOE bears the burden of demonstrating a change in core circumstances. The agency cannot sustain its motion merely by asserting that changed circumstances might appear upon further inquiry after remand.

Considerations of administrative and judicial finality justify placing the burden of proof on the party seeking remand.[6] The proceedings in this case demonstrate the strength of this interest. DOE issued its remedial order to Hunt in 1977. Hunt sought judicial review in 1978. The order was upheld in 1982. Eight years have passed since DOE issued the order. DOE

---

**4.** DOE also argues that before decontrol Cities Service would have spread both the burden of Hunt's overcharges and the benefits of any refund to other refiners and ultimately to the consumer through the Entitlements Program, 10 C.F.R. § 211.67. But DOE took precisely the opposite position before the district court, stating: "Almost all of Hunt's disputed overcharges occurred [sic] prior to the implementation of the Entitlements Program. Therefore, the first purchaser(s) of Hunt's crude oil bore the initial overcharge, rather than all refiners." Memorandum in Support of Defendants' Request for Remedial Action, at 7. In light of this assertion by DOE, the district court certainly did not abuse its discretion in discounting the impact of the Entitlements Program on this case.

**5.** DOE seems to take the position that this Court should invoke the primary jurisdiction doctrine. Under this doctrine, courts asked in the first

instance to decide matters peculiarly within the competence of an administrative agency may seek the agency's views. *See Oasis Petroleum Corp. v. DOE,* 718 F.2d 1558 (Temp.Emer.Ct. App.1983). Here, however, DOE has already considered the matter and reached its conclusion. The district court was not asked to decide in the first instance whether Hunt should pay the refund to Cities Service, but whether circumstances have changed sufficiently to justify reconsideration by DOE of its earlier decision.

**6.** DOE correctly notes that the district court did not mention finality in the unpublished opinion accompanying its order denying remand. As the prevailing party in the district court, however, Cities Service may assert any ground in support of the district court's order. *See Colautti v. Franklin,* 439 U.S. 379, 397 n. 16, 99 S.Ct. 675, 686 n. 16, 58 L.Ed.2d 596 (1979).

asks us to remand to the agency for another round of adjudication, to be followed inevitably by further review in the district court, in this Court, and possibly in the Supreme Court. Surely it is appropriate to require the party seeking to invoke administrative and judicial process for further consideration of a concededly lawful order to show good reason for doing so. *See Solar v. Pension Benefit Guaranty Corp.*, 504 F.Supp. 1116, 1123–24 (S.D.N.Y.) (denying "in the interests of finality" an agency's motion seeking remand), *aff'd per curiam*, 666 F.2d 28 (2d Cir.1981); *see also United States v. Texas Energy Petroleum Corp.*, 719 F.2d 394, 398 (Temp.Emer.Ct. App.1983) (stressing importance of swift resolution of cases brought under Emergency Petroleum Allocation Act, since the Act is no longer in effect); *Rossi v. Mobil Oil Corp.*, 710 F.2d 821, 827 (Temp.Emer. Ct.App.1983) ("The [price and allocation] program no longer exists. Surely it is in the interest of both parties that this litigation be not prolonged unnecessarily.").

■ In light of these concerns, we hold that the district court did not abuse its discretion in finding that DOE failed to sustain its burden of showing a change in core circumstances.[7] This does not mean, of course, that we would necessarily have decided the issue the same way if the motion for remand had been presented to this Court, the relevant inquiry is not how this Court would have ruled in the first instance, but whether the district court's decision fell within the limits of its discretion.

7. We have no doubt that the district court exercised its discretion in finding that DOE failed to show a change in core circumstances. In the unpublished opinion accompanying its order denying remand, the court noted that it was required to enforce the remedial order "so long as the premise for said order is still viable." The court then discussed the "changed circumstances" issue at some length and concluded:

It appears that (1) there has been no significant change in the core circumstances surrounding the issuance of the 1977 remedial order ...; and (2) the justifications set forth by DOE for its reconsideration of its 1977 remedial order are not persuasive in this con-

*See Washington v. Sherwin Real Estate, Inc.*, 694 F.2d 1081, 1087 (7th Cir.1982). Nor are we suggesting that those district courts which have remanded pre-decontrol remedial orders to the DOE[8] have erred in doing so. The range of a court's sound discretion may encompass more than one "right" approach.

## III. CONCLUSION

Our role in this case is simply to decide whether the district court abused its discretion in concluding that DOE did not show a change in core circumstances that would warrant remand of the agency's lawful remedial order. We hold that the court did not abuse its discretion. Consequently, we affirm its order denying DOE's motion to remand.

WILLIAM H. BECKER, Judge, dissenting.

I

The principal, but not only, reason for this dissent is the ultimate conclusion of the majority opinion that admitted illegal overcharges in the price of "stripper well" crude oil (made illegally during regulatory control) under protection of an erroneously issued injunction, after decontrol *should now be paid to the first purchaser-refiner and that:*

"After decontrol, the first purchaser-refiner can simply pocket any refund it receives for overcharges."

text. Accordingly, the court will not order remand of the 1977 remedial order to DOE. This passage clearly demonstrates that the district court considered DOE's arguments in favor of remand and, in an exercise of its discretion, rejected them.

8. *See Grigsby v. DOE*, 561 F.Supp. 50 (W.D.La. 1982), *aff'd on other grounds*, 701 F.2d 147 (Temp.Emer.Ct.App.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1780, 76 L.Ed.2d 350 (1983); *Christmann & Welborn v. DOE*, 4 Energy Mgmt. (CCH) ¶ 26,467 (N.D.Tex. Dec. 20, 1982); *Olympia Exploration Co. v. DOE*, 4 Energy Mgmt. (CCH) ¶ 26,368 (W.D.Okla. Dec. 10, 1981); *Sun-*

This astonishing conclusion[1] (and the many questionable procedural means by which it is reached) is not only unsupported by any precedent, but contrary to the public interest, contrary to justice and contrary to all controlling and persuasive precedents of this and other Courts, as discussed hereinafter.

In contrast to the decision of the majority, after decontrol, Judge Flannery of the District Court of the District of Columbia, reached the contrary conclusion in the most recent judgment on the subject, affirmed by the unanimous opinion of this Court. In that case on the same subject of "stripper well" overcharges, Judge Flannery stated:

As explained above, prior to decontrol in January 1981 DOE controlled the price of oil at every stage of production. In those circumstances, if a court ordered restitution of overcharges to the first purchaser of crude oil, that reimbursement would eventually be passed along to the ultimate consumer of petroleum products. *See Grigsby v. DOE*, 561 F.Supp. 50, 4 Energy Mgt. (CCH) ¶ 26,-378 at 28,841 (W.D.La.1982). Since de-

control, however, there has existed no ready method of ensuring that overcharges will be refunded to their ultimate victims, the consumer. *To order a refund to the first purchaser would simply result in a windfall gain for that purchaser—ironically, in this case, Exxon itself—would be under no obligation to pass the refund along.* (Emphasis added.) *United States v. Exxon*, (D.D.C.1983) 561 F.Supp. 816 at page 854, affirmed *United States v. Exxon* (TECA 1985), 773 F.2d 1240, cert. denied — U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926.

In the majority opinion[2] this Court holds that the District Court, which, for over five years erroneously suspended by invalid injunction, enforcement of a lawful enforceable petroleum price control "stripper well" statute and regulation, has discretion, after price decontrol, to order the illegal overcharges paid to the first purchaser, to "simply pocket," for its use and benefit.

This conclusion fails to recognize the controlling precedents of this Court[3] and of

---

*dance Oil Co. v. DOE*, 4 Energy Mgmt. (CCH) ¶ 26,345 (D.Colo. Oct. 23, 1981).

1. This quotation is part of a conclusion stated in full by the majority as follows:

Before decontrol, the first purchaser-refiner such as Cities Service, upon receiving a refund from its crude oil supplier, would have been required either to reduce its maximum lawful selling price or to draw upon its "bank" of unrecouped costs. In either case, the refiner might have been forced to cover the price it charged its customers for refined products. Ultimately, DOE contends, this price reduction would have been passed through the marketing chain to the consumer. In this manner the refund would have found its way to those who bore the brunt of the overcharges. (Footnote omitted.)

2. An unrelated earlier interlocutory unanimous opinion of this Court in these consolidated appeals is reported in 734 F.2d 816 (TECA 1984).

3. The image of this Court (TECA), described by Ervin N. Griswold, former Dean of Harvard Law School and former Solicitor General of the United States in his 1983 Brendan F. Brown Lecture, may disappear if the majority opinion endures. There former Dean and Solicitor General Griswold said:

(b) The other little-known court is the Temporary Emergency Court of Appeals, which has exclusive jurisdiction to review decisions of all of the district courts in the United States in the energy field. Following a precedent established with respect to price-control laws during World War II, the present Temporary Emergency Court of Appeals was set up under an amendment to the Economic Stabilization Act of 1970 to deal with wage and price stabilization. That authority has now expired, but the jurisdiction of the court was extended to actions under the Emergency Petroleum Allocation Act of 1973.

It is important at this point to observe that one reason that the Temporary Emergency Court of Appeals is so little-known is because it has worked so well. There are no conflicts in the energy field, because energy cases cannot come before any other court. In the twelve years since the court was established, apparently no decision of the court has been reviewed by the Supreme Court. Petitions for *certiorari* are very rare. As a consequence, the petroleum laws are administrable in the law office. Once the Emergency Court of Appeals has spoken, the law offices—and the Government officers—know what the law is. This has clearly reduced overall litigation, as well as the volume of cases in the Supreme

the Supreme Court of the United States, (based on the paramount public interest in the benefits of lawful enforceable petroleum price control statutes and regulations) erroneously suspended by an invalid injunction during price control. These controlling authorities are applicable after the invalid injunction has been set aside after decontrol and hold that a District Court cannot order payment of the illegal overcharges to the first purchaser-refiner to "simply pocket."

As stated above, this conclusion of the majority is contrary, as demonstrated hereinafter, to all controlling authorities of this Court, of the Supreme Court of the United States, and contrary to all persuasive authority of the District Courts and of the several United States Courts of Appeal.

In addition, there are many erroneous subordinate findings and conclusions of the majority opinion as explained hereinafter in Part X hereof.

## II

### CONTROLLING CASES OF THIS COURT (TECA)

The principal cases from this Temporary Emergency Court of Appeals (TECA) that are contrary to this erroneous conclusion of the majority (listed in inverse chronological order, most recent first), are the unanimous opinions in *United States v. Exxon Corporation (Exxon II)* (TECA 1985), 773 F.2d 1240, cert. denied — U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986) (The partial dissent on points of procedure in cited *Exxon II* case, *supra*, is not material to this dissent); *Citronelle-Mobile Gathering Co. Inc. v. Edwards (Citronelle)* (TECA 1982), 669 F.2d 717, cert. denied 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141; *Sauder v. Department of Energy* (TECA 1981), 648 F.2d 1341. These cases are discussed in Part VIII hereinafter.

In the *Exxon II* case, *supra*, 773 F.2d 1240, this Court (TECA) noted that Exxon claimed all or part of the illegal overcharge funds "because it was a 'first purchaser' of

production or because it, as a refiner, was a participant in the Entitlements program, or because it was impossible to identify all the victims." 773 F.2d at page 1281. In contrast to this holding of the majority in this case, in the *Exxon II* case, *supra*, the claim of Exxon as a first purchaser-refiner was rejected as contrary to the controlling *Citronelle* case, *supra*. See the express holdings in the *Exxon II* case, *supra*, Part C. at pages 1283 to 1287 of 773 F.2d.

The principal cases from this Court (TECA) cited above consistently follow the following principal controlling cases of the Supreme Court of the United States, which hold that a District Court erroneously suspending enforcement of a valid price contract or rate order has no power or discretion, after decontrol, to award the use and benefit of the suspended illegal overcharges to the first purchaser for it to "pocket" (free of public benefit and free from judicial or administrative remedial processes) as erroneously done in this case, decided over five years after petroleum price decontrol, and the consequent dismantling on decontrol of the normal administrative remedial processes which were effective during control to protect the paramount public interest.

## III

### CONTROLLING CASES OF THE SUPREME COURT OF THE UNITED STATES

The principal controlling cases of the Supreme Court of the United States (Supreme Court) consistently followed by this Court on this issue are: *Federal Power Commission v. Interstate Natural Gas Company (Interstate Natural Gas)*, 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949); *United States v. Morgan (Morgan II)*, 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); *Porter v. Warner Holding Company (Warner Holding)*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Mitchell v. De*

Court. [32 *Catholic University Law Review*    787 at 805–806 (1983).]

*Mario Jewelry (De Mario Jewelry)*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

## IV

## PERSUASIVE CASES OF DISTRICT COURTS AND CIRCUIT COURTS OF APPEAL CONTRARY TO MAJORITY DECISION

The persuasive District Court cases awarding to the public, illegal overcharges made under protection of an illegal injunction are: *United States v. Exxon Corporation* (D.D.C.1983), 561 F.Supp. 816, affirmed by this Court and certiorari denied in the Supreme Court; the TECA *Exxon II* case, *supra*, 773 F.2d 1240, cited above; *United States v. Robert B. Sutton, et al* (N.D.Okla.1982) recently affirmed by this Court in (TECA 1986) 795 F.2d 1040, cited with apparent approval in the *Exxon II* case, *supra*, 773 F.2d 1240 in note 53 at page 1287; Re: *In re Stripper Well Multidistrict Litigation* (D.C.Kan. 1983), 578 F.Supp. 586, at pages 590 to 594, an identical case, in which payment to the first purchaser was denied, in which it was stated by the District Court after discussing the issues:

> Having concluded that recovery is not limited to the first purchasers ... the Court must now consider whether it is clearly impossible to ascertain with particularity the parties that bore the burden of the overcharges. 578 F.Supp at 594.

The conclusion reached in the majority opinion in this case is not only without supporting precedent, as will be discussed in detail later, but among other errors (a) fails to recognize the paramount public interest in just repayment of illegal overcharges before and after decontrol of petroleum price and allocation, (b) fails to recognize the equitable duties of the District Court, and (c) applies erroneous procedural rules, as demonstrated in Part X hereafter, to support the result reached.

Recognition and satisfaction of the paramount public interest is required by decisions of this Court (TECA), the Supreme Court and by the Congress of the United States.

Among the many cases from the Circuit Courts of Appeal on the duty and power of a District Court improperly issuing an injunction not to award the illegal overcharges to one who showed no damages are: *Middlewest Motor Freight Bureau (Middlewest)* (C.A.8 1970) 433 F.2d 212, cert. denied 402 U.S. 999, 91 S.Ct. 2169, 29 L.Ed.2d 165 (1971); *Coyne-Delaney Co., Inc. v. Illinois Capital Development Board*, (C.A.7 1983) 717 F.2d 385 at 390–392; *State of Tennessee ex rel. Leech v. Dole*, (C.A.6 1984) 749 F.2d 331 at 337; *U.S. v. Coca-Cola Bottling Company of Los Angeles*, (C.A.9 1978) 575 F.2d 222 at 228, cert. denied, 439 U.S. 959, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978); *Commodity Futures Trading Commission v. Hunt*, (C.A.7 1979) 591 F.2d 1211, cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Securities and Exchange Commission v. Texas Gulf Sulphur Company*, (C.A.2 1971) 446 F.2d 1301 at 1307, cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971); *Moss v. Civil Aeronautics Board*, (C.A.D.C.1975) 521 F.2d 298 at 306, cert. denied, 424 U.S. 966, 96 S.Ct. 1460, 47 L.Ed.2d 732 (1976); *Interstate Commerce Commission v. B & T Transportation Co.*, (C.A.1 1980) 613 F.2d 1182.

## V

## UNUSUAL IMPORTANCE OF THIS CASE

This decision of this Court (TECA) in this case is unusually important to the public interest and administration of justice. Its importance is emphasized by the current continuing standby nature of Executive power of administrative control of petroleum price and allocation (in the currently effective Energy Policy and Conservation Act of 1975, P.L. 94–163, 89 Stat. 871, 42 U.S.C. § 6201, described and upheld against the "single house veto" rule, in Part E. of *Exxon Corporation v. United States Department of Energy (Exxon I)* (TECA 1984), 744 F.2d 98, cert. denied 469 U.S. 1077, 105 S.Ct. 576, 83 L.Ed.2d 515).

Under this currently effective *standby* authority, the President at any time may

reimpose petroleum price and allocation controls, if circumstances again warrant, (which possibly can occur if, for example, the effective control of the OPEC or other cartel, over world prices of crude oil is restored). In that event, this judicial opinion and the continuing powers of this Court become extremely important in future protection of the public interest of this Nation. So the need for consistent decisions by this Court (TECA) during decontrol is more important than ever.

And above all these considerations is the National purpose of giving this Court exclusive judicial jurisdiction over controversies in petroleum price and allocation enforcement of statutes and regulations. The prime purpose in giving this Court exclusive national jurisdiction in this field was to guarantee quick continuing *uniform nationally* effective judicial rulings. This prime purpose is frustrated by the failure of this Court to follow in this case the otherwise uniform rulings of this Court (TECA) and of the Supreme Court in the same circumstances.

## VI

### FAILURE OF MAJORITY TO FOLLOW CONTROLLING CASES

Assuming as a fact (which is doubtful, as discussed hereinafter) that the majority correctly found that the District Court purported to make "a decision whether to grant an agency's motion to remand for changed circumstances" in the exercise of "the sound discretion of the (District) Court," the holding of the majority is erroneous because legally *there is no judicial discretion* or power to order the payment of the illegal overcharges to the first purchaser, to "pocket" for its use and benefit.

## VII

### ANALYSIS OF SUPREME COURT CASES DENYING DISCRETION AND POWER TO PAY ILLEGAL OVERCHARGES TO THE FIRST PURCHASER

The following section of this opinion cites and quotes from the opinions of the Supreme Court of the United States that are contrary to the conclusion of the majority in this case that the District Court possessed a "sound judicial discretion" and power to order the illegal overcharges in the erroneously judicially created escrow fund of illegal overcharges to be paid to the first purchaser-refiner for its use and benefit ("pocket") without proof that the first purchaser absorbed the overcharge.

For example, this conclusion is contrary to the decision of the Supreme Court of the United States in *Federal Power Commission v. Interstate Natural Gas Company (Interstate Natural Gas)*, 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949). In that case the Supreme Court of the United States *expressly* reversed an order that the Court make payment of overcharges to the *first purchasers rather than to the consumers* of natural gas (of a fund accumulated in escrow pending judicial review of the validity of a Federal Power Commission (EPC) order reducing rates for natural gas). The pipeline companies, that were the direct purchasers (first purchasers), claimed the fund, but petitioner and several state and municipal agencies claimed that the fund should be paid to the ultimate consumers. The Court of Appeals erroneously ordered payment to the first purchasers, the pipeline companies, on the authority of *Central States Electric Company v. Muscatine (Central States)*, 324 U.S. 138, 65 S.Ct. 565, 89 L.Ed. 801 (1945). The Supreme Court distinguished *Central States, supra,* on the fact that in the *Interstate Natural Gas* case, *supra,* under review, the pipeline companies were subject to the jurisdiction of the EPC and federal law; and found that the aim of the Natural Gas Act was "to protect ultimate consumers of natural gas from excessive charges" because "[t]hey were the intended beneficiaries of rate reductions ordered by the federal commission...." *Interstate Natural Gas, supra,* 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. at 901. In that case the Supreme Court reasoned that reduced rates would have been passed through by the wholesal-

er "unless we are to assume that the passage of the Natural Gas Act (like the EPAA here) was an exercise in futility." *Interstate Natural Gas, supra,* 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. 895 at 901. In that case the Supreme Court of the United States further *expressly held that the lower court must look beyond the first purchaser and seek the proper recipients of the fund* stating:

> But apart from those exceptions [unreasonably low rates by pipeline companies or pass through of rate reductions], it is the duty of the court to look beyond those companies for the rightful claimants of the fund. *It is the responsibility of the court which distributes the fund accumulated under its stay order 'to correct that which has been wrongfully done by virtue of its process.'* (Emphasis added.) *United States v. Morgan,* 307 US 183, 197, 83 L ed 1211, 1220, 59 S Ct 795 [802]. *That responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.* (Emphasis added.)

\* \* \* \* \* \*

When a federal court of equity grants relief by way of injunction it has a responsibility to protect all the interests whom its injunction may affect. *Inland Steel Co. v. United States,* 306 US 153, 83 L ed 557, 59 S Ct 415. It assumes the duty to make disposition of the fund in accord with equitable principles. *United States v. Morgan, supra,* (307 US at 191, 83 L ed 1217, 59 S Ct 795 [at 799]). If in a particular case the court reaches the question of reasonableness of rates, it does so only for purposes of distributing the fund for whose creation it alone was responsible. It does not fix or prescribe rates for the past or the future. The reasonableness of rates charged by the companies who claim the fund is wholly ancillary to the problem of determining what claimants are equitably entitled to share in it.

\* \* \* \* \* \*

*In conclusion the task of the federal court in distributing the fund accumulated by virtue of its stay order is to undo the wrong which its process caused.* (Emphasis added.) The basic problem, therefore, is not to fix rates but to determine who suffered a loss as a result of the court's action in granting the stay. What in fact would have happened as a consequence of federal or state law if the stay had not been issued, no one can know for a certainty. But federal court must make its prognostication, whether an excursion into federal or state law questions is entailed. Distribution of the fund should not involve prolonged litigation. It is an administrative matter involving the exercise of an informed judgment by the federal court and should have the flexibility and dispatch which characterize the administrative process. *Interstate Natural Gas, supra,* 336 U.S. at 582, 69 S.Ct. at 778, 779, 93 L.Ed. at 901–903.

The majority in this case seeks to avoid application of these controlling principles by ignoring established equitable and legal principles, and by stating some reasons (that the District Court did not expressly enunciate in its opinion and its supplemental opinion as set forth in Part X hereof). The majority in this case concludes with the erroneous statement of law, quoted above, unsupported by any precedent, that:

> After decontrol, by contrast, the first-purchaser refiner can simply pocket any refund it receives for overcharges; no pass through is required.

The majority does not explain why it does not require the District Court to "undo the wrong which its process caused" as required by the Supreme Court of the United States in *Interstate Natural Gas, supra,* 336 U.S. at 581, 69 S.Ct. at 778, and later cases of this Court cited in Part II hereinabove.

In contrast, all Courts, including this Court (TECA), heretofore dealing with illegal overcharges in violation of the "stripper well" statute and regulation have ordered the payment to the States for the

benefit of the public, after decontrol. See *Controlling Cases of this Court* (TECA), *supra,* Part II hereof.

In contrast to the holding by a majority in this case, in the last controlling case before this Court, it has been held that the District Court could judicially notice in rendering summary judgment that the illegal overcharges were

"spread throughout the distribution chain to the ultimate consumer and that it was impossible to trace the overcharges." *United States v. Exxon Corporation (Exxon II), supra,* 773 F.2d at page 1281. (TECA 1985) cert. denied — U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926.

In this last controlling case this Court (TECA) applied the expressly controlling rule of law that the overcharges would not legally be paid to first purchaser-refiner for its use and benefit ("to pocket").

How one District Court can ignore an equitable duty, and a fact that another District Court can judicially notice, and apply as a bases of summary judgment is not explained in the majority opinion.

The controlling Supreme Court cases to the same effect as the *Interstate Natural Gas* case, *supra,* are cited above in Part II hereof. They are *Warner Holding, supra,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1392 (1946); *Morgan II, supra,* 307 U.S. 183, 59 S.Ct. 795, 83 L.Ed. 1211 (1939); *De Mario Jewelry, supra,* 361 U.S. 298, 80 S.Ct. 338, 4 L.Ed.2d 323 (1960). Further extended discussion and quotations from these cases are deemed cumulative and undesirable. Reading of them by those interested is deemed sufficient.

## VIII

## ANALYSIS OF CONTROLLING TECA CASES CONTRARY TO MAJORITY DECISION

The principal controlling cases from this Court (TECA) in addition to the unanimous opinion of the Court (TECA) in the *Exxon II* case, *supra,* include the following.

*Citronelle-Mobile Gathering Co., Inc. (Citronelle), supra,* 669 F.2d 717, cert. de-nied 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141, in which the Secretary of Energy on behalf of the United States asserted an enforcement counterclaim under § 209 of the ESA on behalf of domestic customers alleged to have been overcharged. The District Court granted a partial summary judgment for the United States (Secretary) on the counterclaim under § 209 holding that the appellants (Citronelle-Mobile Gathering, Inc., and others) collected excess prices (illegal overcharges) in violation of the ESA and EPAA and regulations thereunder. In the *Citronelle* case, *supra,* this Court then ordered and authorized repayment of the illegal excess overcharges by deposit in a trust account in accordance with the then existing General Accounting Office Procedures, or under a plan for a "Deposit Fund Account" *or other appropriate procedures to be approved by the District Court* stating in part:

An immediate confrontation with the method/process of enforcement emerges. Neither appellants, nor various *amici* attack restitution as being outside the scope of relief authorized, rather, they insist the decision ordering restitution to the United States Treasury is beyond the District Court's authority. The Court finds on this issue no justification for allowing plaintiffs to retain their illegal gains.

The district court, sitting as a Court of Equity, unless otherwise provided by statutes here in contemplation, had 'all the inherent equitable powers of the District Court ... available for the proper and complete exercise of that jurisdiction'; *Porter, supra* 328 U.S. at 398, 66 S.Ct. at 1089, and has power, 'to do equity and mould each decree to the necessities of the particular case'; further, 'It may act so as to adjust and reconcile competing claims ... so as to accord full justice to all the real parties in interest....' *The authority inherent in the equity powers guarantees complete rather than truncated justice. Camp v. Boyd,* 229 U.S. 530, 551, 33 S.Ct. 785, 793, 57 L.Ed. 1317 (1913). The power of

1432

a district court to require restitution, as was pronounced in *United States v. Lieb*, 333 F.Supp. 424 (W.D.Tex.1971), was specifically endorsed and ratified by Public Law 92–210 [5] (Footnote 5, *See* U.S.Code and Congressional News, 92nd Congress, 1st Session (1971) pp. 2283, 2291.) (Sec. 209), but nothing has been pronounced as to payment to the United States Treasury. Federal district courts unquestionably possess broad discretion in fashioning equitable remedies, *Franks v. Bowman Transportation, Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1975) but, as contemplated in the exercise of these powers to remedy civil wrongs and restore civil rights, *the authority is vested to make the victims whole, 'so far as possible, and restored to a position where they would have been had it not been for' the unlawful violation, such as was practiced here.* (Emphasis added.)

The ruling of this case was followed in the unanimous (on this issue) opinion of this Court (TECA) in the *Exxon II* case, *supra*, 773 F.2d 1240, cert. denied — U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), affirming the express conclusion of District Judge Flannery to the contrary in 561 F.Supp. at page 854, quoted above in Part I.

An attempt is made in the majority opinion to explain why the failure to apply holding of these controlling cases by stating that this Court is "not asked to determine the district court's power or duty to fashion a restitutionary remedy." No attempt is made to explain why the District Court and this Court (TECA) are not obligated to apply the controlling requirement that the District Court was required to "right the wrong" its erroneous injunction caused. The motion of DOE to remand was a request to remand for fashioning an administrative remedy for the wrongful overcharges, and the wrongful effect of the illegal injunction suspending the remedies for years. But above that, the District Court, and this Court (TECA), have a power and *duty* under the law, resulting from the erroneous invalid injunction and illegal

overcharges made thereunder. This *duty* is to fashion a remedy for the wrongs resulting from the erroneous injunction and resulting illegal overcharges made as a result thereof. To provide the first purchaser with an underserved windfall to pocket does not satisfy that judicial duty.

It is no answer to declare as the majority does in this case, that

"After decontrol, by contract, the first purchaser-refiner can simply pocket any refund it receives for overcharges."

Only by unauthorized illegal action of the District Court can the first purchaser-refiner receive any refund for overcharges to "simply pocket" for its use and benefit. This illegal action of the District Court should be reversed by this Court and the case remanded for further lawful proceedings.

Furthermore, as stated hereinafter in Part X, neither the DOE nor the United States could waive or be estopped to assert the rights of the public.

IX

THE MAJORITY APPLIED AN ERRONEOUS BURDEN OF PROOF RULE THAT IS CONTRARY TO (A) THE CONTROLLING DECISIONS OF THE SUPREME COURT AND (B) OF THIS COURT (TECA)

In order to sustain the decision of the District Court to order the payment of the illegal overcharges, collected for years under the unlawful protection of an admittedly invalid injunction of the District Court, the majority erroneously held that the burden of proof of "change in core circumstances" rested on the Department of Energy (DOE). In so ruling the majority in part stated:

As proponent of the remedial motion, DOE bears the burden of demonstrating a change in core circumstances.... Considerations of administrative and judicial finality justify placing the burden of proof on the party seeking remand.

(Footnote 6 to be mentioned later omitted.)

The most recent controlling decision of this Court on the subject is the *Exxon II* case, *supra,* affirming the District Court in its express refusal to order payment of the illegal overcharges to the first purchaser-refiner cited and quoted from in Parts I and II above.

As stated, in Part II above, this Court (TECA) in the *Exxon II* case, *supra,* affirmed unanimously the holding of the District Court in which it stated:

> To order a refund to the first purchaser would simply result in a windfall for that purchaser ... who would be under no obligation to pass the refund along. *United States v. Exxon* (D.D.C.1983) 561, F.Supp. 816 at page 834, affirmed in *United States v. Exxon* (TECA 1985), 773 F.2d 1240, cert denied —— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986).

Laying aside for the moment the "change in core circumstances" standard the majority ignored the (1) decisions of the Supreme Court and (2) the decisions of this Court (TECA) discussed above that uniformly require the first purchaser to bear the burden of proving ("showing") that the first purchaser sustained loss by reason of the invalid injunction and consequent illegal overcharges. For example, use the opinion of the Supreme Court in *Interstate Natural Gas* case, *supra,* 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949) discussed and quoted above, in which it stated:

> It is the responsibility of the court which distributes the fund accumulated under its stay order 'to correct that which has been done wrongfully by virtue of its process.' *United States v. Morgan,* 307 U.S. 183, 197, 83 L.Ed. 1211, 1220, 59 S.Ct. 795 [802]. *That responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.* (Emphasis added.) 336 U.S. at 582, 69 S.Ct. at 778, 779, 93 L.Ed. at 901–03.

The discussion of the failure of the majority to follow the other cited controlling cases of the Supreme Court and of this Court (TECA) is set forth hereinabove in Parts II and III of this opinion, and hereinafter in Part X E. hereof.

The persuasive cases of the District Court contrary to the majority decision are set forth in Part IV hereinabove.

## X

**THE PRINCIPAL ERROR OF THE MAJORITY WAS MADE POSSIBLE BY THE FOLLOWING SERIES OF UNDERLYING ERRONEOUS ADDITIONAL SUBSTANTIVE AND PROCEDURAL FINDINGS AND CONCLUSIONS:**

### ADDITIONAL SUBSTANTIVE ERRORS

A. The Majority Erred In Finding As A Fact That The District Court Exercised A Discretion In Awarding The Illegal Overcharges To The First Purchaser-Refiner.

To demonstrate that, contrary to the finding of fact of the majority, the District Court *did not conclude or believe that it had a legal judicial discretion to determine the party or parties* who should be awarded illegal overcharges the (1) history of stripper well litigation in the District Courts and (2) the record of conclusions of law of the District Court under review are set forth.

(1) History of the Multidistrict Stripper Well Exemption Litigation in the District Courts Prior to Final Judgment by the District Court in this Case:

In issue in these appeals is the nature and extent of the power of the District Court to determine the disposition of funds in escrow, representing overcharges in violation of the stripper well regulations, collected under the protection of an injunction of the District Court which was later vacated as improvidently granted.

The relevant history of the earlier multidistrict proceedings in the District Courts of the United States leading to the challenged judgment in the District Court of the Northern District of Texas finally up-

holding the application of the once challenged stripper well regulations of the Department of Energy (DOE), to the wells of the plaintiff-appellee Ray L. Hunt, Independent Executor (Executor of the *Hunt Estate*), and others, is summarized in the reported opinion of the District Court in the consolidated cases *Prosper Energy Corporation v. Department of Energy,* including the *Hunt* case (N.D.Texas 1982), in 549 F.Supp. beginning at page 300. The relevant part of that opinion (with footnotes omitted) is as follows:

"Plaintiffs in these cases,[1] now consolidated under case number CA–3–78–0244–W, seek a declaratory judgment declaring invalid the Department of Energy's (DOE's) stripper well regulation to the extent that it excludes injection and shut-in wells from the well count in determining eligibility for stripper well classification. By Order dated June 29, 1979 the Judicial Panel on Multidistrict Litigation (JPMDL) transferred these consolidated cases to the United States District Court for the District of Kansas for consolidation with similar actions for the purpose of conducting pretrial proceedings. By Order of July 8, 1980 the JPMDL remanded that portion of these cases which concerned the validity of the stripper well regulation, as interpreted to exclude shut-in wells from the well count, to this Court. At the conclusion of pretrial proceedings, the remaining issue in the cases regarding the validity of the regulation, as it excluded injection wells, was also remanded to this Court. This Court announced on January 21, 1981 that it would hold these cases in abeyance pending the outcome of the litigation in the District Court for the District of Kansas. The District Court issued its opinion on July 14, 1981. *In re Department of Energy Stripper Well Exemption,* 520 F.Supp. 1232 (D.Kan.1981). The Temporary Emergency Court of Appeals has heard the case, reversed the holding of the District Court, denied motions for rehearing and rehearing *en banc,* and issued its Mandate. (September 17, 1982). *In re the Department of Energy Stripper Well Exemption Litigation (Energy Reserves II),* 690 F.2d 1375,

(Em.App.1982), motion for rehearing and rehearing *en banc* denied September 15, 1982, and motion for stay of the Mandate denied September 17, 1982.

"These lawsuits involve challenges to the Department of Energy's stripper well regulation, as interpreted by Ruling 1974–29. That Ruling has been upheld by the courts against both procedural challenge[2] and substantive challenge.[3] Plaintiffs now seek to attack the regulation itself. (Plaintiffs' Response to Defendants' Motion for Summary Judgment, p. 5).

"The statutory and regulatory history of the Department of Energy's stripper regulations is a long and convoluted one.[4] Section 4(e)(2) of the Emergency Petroleum Allocation Act of 1973 (EPAA), Pub.L. No. 93–159, 87 Stat. 627, 15 U.S.C. §§ 751 *et seq.,* created an exemption from price regulations for first sales of domestic crude oil produced on stripper well properties (*i.e.,* leases whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well).[5] Pursuant to section 4(e)(2)(C) of the EPAA, the President delegated his authority to promulgate and publish regulations implementing the EPAA to the Administrator of the Federal Energy Office. Executive Order 11748, 38 Fed.Reg. 33575 (December 6, 1973). In December of 1973 the Federal Energy Office (FEO) initiated informal rule making procedures under section 553(b) of the Administrative Procedure Act (5 U.S.C. § 553(b)). 38 Fed.Reg. 34414 (December 13, 1973). Shortly thereafter, final regulations were issued, 39 Fed.Reg. 755 (January 2, 1974), and codified at 10 C.F.R. § 210.32, 39 Fed.Reg. 35510 (October 1, 1974).

"As noted by the Court of Appeals in *In re the Department of Energy Stripper Well Exemption Litigation* (Energy Reserves II), 690 F.2d 1375 (Em.App.1982), controversy soon arose over whether the term 'well,' as used in the regulations, included injection wells, shut-in wells, spent wells, etc.[6] To resolve this problem, the Federal Energy Administration (FEA) issued Ruling 1974–29, which *expressly* excludes such

wells from the calculation of average daily production in determining the applicability of the stripper well exemption from the price control program.[7]

"Ruling 1974–29 was attacked initially on the ground that it was promulgated without satisfying the rule making requirements of the Administrative Procedure Act (APA). In *Energy Reserves Group, Inc. v. Federal Energy Administration*, 447 F.Supp. 1135 (D.Kan.1978), the district court invalidated the Ruling on this ground. On appeal, the Court of Appeals reversed, holding that the Ruling was interpretative and exempted from the procedural requirements of the APA. *Energy Reserves Group, Inc. v. Department of Energy (Energy Reserves, I)*, 589 F.2d 1082 (Em.App.1978). In the course of ruling on this procedural challenge, the Court of Appeals suggested that Ruling 1974–29 was 'a reasonable interpretation of the term "average daily production" as used in § 406 of TAPAA, § 4(e)(2)(A) of the EPAA, and in 10 C.F.R. § 210.32(b)....' *Duncan v. Theis*, 613 F.2d 305, 308 n. 4. (Em.App. 1979). In a case dealing with the Department of Energy's Marginal Property Rule, a regulation analogous to the stripper well exemption regulation, the Court of Appeals stated "the prior decisions construing the interpretative stripper well Ruling 1974–29 to be consistent with a similar underlying statute are decisive." *Wiggins Bros. Inc. v. Department of Energy*, 667 F.2d 77, 89 (Em.App.1981) (citations to *Energy Reserves I* and *Duncan v. Theis* omitted). Finally, in *Energy Reserves II* the Court of Appeals concluded as follows:

In summary, we find:

1) The legislative history of the stripper well exemption amply supports the DOE's position that injection wells were not intended by Congress to be included in the well count;

2) Ruling 1974–29 is not beyond the authority of the DOE granted by the controlling statutory provisions;

3) Our prior decision in *Energy Reserves I, Duncan v. Theis* and *Wiggins* have correctly decided that Ruling 1974–29 is a reasonable interpretation of the applicable statutes and regulations; and

4) The stripper well regulations, as interpreted by Ruling 1974–29, are neither arbitrary nor capricious.

For all these reasons, the decisions of the district court is reversed, and these consolidated cases are remanded to the district court with instructions to enter judgment for the defendants-appellants. *Energy Reserves II*, 690 F.2d at 1392.

"Plaintiffs in this suit seek a judgment declaring invalid the stripper well regulation 'to the extent that the regulation excludes injection and shut-in wells from the well count in determining eligibility for stripper well classification.' (Plaintiffs' Response pp. 1–2). Defendants contend that this court is foreclosed from making such a declaration by the conclusions of the Court of Appeals in *Energy Reserves II* and have moved for summary judgment. Plaintiffs have responded by arguing that the following issues are not foreclosed by the opinion of the Court of Appeals in *Energy Reserves II:* (1) whether DOE had statutory authority to exclude injection and shut-in wells from the well count under the stripper well regulation; and (2) whether DOE's interpretation of the stripper well regulation to exclude injection and shut-in wells was arbitrary and capricious. (Plaintiffs' Response pp. 10–18). In view of the frequency of remands of litigation in this area, this court wishes to state its belief that the following discussion disposes of any and all issues, save that of remedy, presently before this court in these cases.

### Statutory Authority Issue

"The Department of Energy (DOE) clearly had the statutory authority to issue its stripper well exemption regulation. Section 4(e)(2)(C) of the EPAA gives a properly designated agency the authority to promulgate regulations implementing the statutory stripper well exemption. Plaintiffs have not alleged that there was anything improper in the chain of delegation from

the President to the FEA with regard to this regulation.

"Where the empowering provision of a statute gives an agency general authority to issue regulations implementing that statute, a regulation promulgated thereunder will be sustained 'so long as it is "reasonably related to the purposes of the enabling legislation." ' *Mourning v. Family Publications Services, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). As pointed out by the Court of Appeals in *Energy Reserves II,* when the Congress enacted the stripper well exemption it intended that the regulations implementing the exemption 'provide appropriate limitations and provisions in the definition of "lease" to insure that an administratively workable system is established *which does not permit abuse.*' *Energy Reserves II,* 690 F.2d at 1387 (emphasis added). 'The legislative history of the stripper well exemption amply supports the DOE's position that injection wells were not intended by Congress to be included in the well count.' *Id.* at 1392. The plaintiffs have made no effort to attempt to distinguish shut-in wells from injection wells and the legislative history of the stripper well exemption belies the notion that Congress ever intended such a distinction. 'Ruling 1974–29 is not beyond the authority of the DOE granted by the controlling statutory provisions.' *Id.*

"Therefore, this court finds that the DOE was well within its statutory authority when it promulgated the stripper well regulation, as interpreted by Ruling 1974–29.

### *Arbitrary and Capricious Issue*

"The Court of Appeals has now held on at least four separate occasions that Ruling 1974–29 is a reasonable interpretation of the applicable statutes and regulations. *Id.* at 1392. In its most recent case, it also *expressly* held that *the stripper well regulations themselves,* as interpreted by Ruling 1974–29, are neither arbitrary nor capricious. *Id.* Plaintiffs contend that the latter holding is not supported by the opinion of the Court of Appeals in *Energy*

*Reserves II.* (Tr. 66–69, Hearing September 8, 1982). This contention was raised by the plaintiffs in their motions for rehearing and rehearing *en banc* before the Court of Appeals and was rejected by that Court. Furthermore, the Court of Appeals in *Energy Reserves II* has remanded that case to the district court with instructions that *a judgment* be entered in favor of the defendants-appellants. *Energy Reserves II,* at 1392. In such circumstances, this court must assume that the Court of Appeals meant to dispose of *all* of the issues involved in *Energy Reserves II,* including whether the stripper well regulation itself was arbitrary or capricious. The plain meaning of the language in *Energy Reserves II* can afford no other interpretation.

### *Other Remaining Issues*

"Plaintiffs have alleged that there are numerous factual issues still before this court which preclude it from granting defendants' motion for summary judgment. These 'factual issues,' plaintiffs contend, include the following:

'1. What part injection and shut-in wells play in secondary recovery techniques for the production of crude petroleum.

2. Whether the use of injection and shut-in wells in secondary recovery techniques contributes to a property's economic life, thus maintaining production and recoverable reserves.

\*    \*    \*    \*    \*    \*

5. The extent to which the supply of domestic crude oil would be decreased by excluding injection and shut-in wells from the well count for purposes of the stripper well regulation.' (Plaintiffs' Response pp. 11–12).

"The only issues left for resolution by this court were those previously discussed. Whether an action by an administrative agency is either outside its statutory authority or arbitrary and capricious are purely legal issues.[8] The 'fact issues' that plaintiffs allege are still before this court are not justiciable issues in the context in

which they are presented. Rather, they are considerations best left to the judgment of legislators and rule making authorities.[9] It is not within the province of this court to re-write administrative regulations based upon economic or other policy considerations. *FCC v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 792–93 n. 15, 98 S.Ct. 2096, 2110–11 n. 15, 56 L.Ed.2d 697 (1978); *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 619, 64 S.Ct. 1215, 1222, 88 L.Ed. 1488 (1944); *McCulloch Gas Processing v. Dept. of Energy,* 650 F.2d 1216, 1229–30 (Em.App. 1981).

"Therefore, the defendants' motion for summary judgment in this consolidated lawsuit is granted. While this decision disposes of the substantive issues presented, it does not dispose of the issue of what remedy is to be afforded the parties in these cases. *More specifically, it does not dispose of the fate of the funds currently in escrow.* The remaining issues of remedy will be dealt with by this court pursuant to the briefing schedule previously issued. (Emphasis added.)

"(2) Express Record of Conclusion of District Court That it had no Authority to Exercise Discretion:"

In its subsequent unreported memorandum of July 25, 1983, making additional findings of fact and conclusions of law concerning the illegal overcharges in this case involving the Hunt overcharges, the *District Court clearly and expressly concluded that it had no authority (or legal judicial discretion)* to determine to whom to award the illegal overcharges in the escrow fund. This conclusion was clearly expressed in the following express conclusion of law of the District Court:

Accordingly, the present action by Hunt, being merely a suit to declare invalid an order of the DOE, and such order having been implicitly held valid, *the court has no authority to do anything other than enforce said order,* so long as the premise for said order is still viable. (Emphasis added.)

Further, the final judgment of the District Court of July 25, 1983, followed the above conclusion and did not mention discretion.

This conclusion of the District Court, quoted above, is ignored by the majority in its erroneous finding that the District Court exercised a lawful judicial discretion.

Of course the conclusion, quoted above, is erroneous in the light of opinions of this Court (TECA) and of the Supreme Court of the United States cited in Parts III, IV, VII and VIII hereinabove, but it was the basis of the erroneous judgment below, now erroneously affirmed by the majority. The majority in Footnote 7 of its opinion attempted, without support in law or fact, to supply in the footnote statements of the exercise of discretion, that do not appear expressly or by implication in the findings and conclusions of the District Court. In fact the word "discretion" does not appear anywhere in the reported opinion of the District Court in 549 F.Supp. 300 et seq. or in the unreported parts of the record before us (including the memorandum of July 25, 1983, quoted hereinafter in paragraph D of this Part X).

It would be fairer to the District Court, and in keeping with justice to retain jurisdiction of these appeals, and to remand this issue to the District Court to speedily make a record on the issue of exercises of discretion under the controlling cases, as can be lawfully done by this Court in the interest of speed. See *Marine Petroleum Co. v. Champlin Petroleum Co.* (TECA 1980) 657 F.2d 1231 at 1245 through 1248 and cases therein cited.

B. The Majority Erred in Failing to Follow the Uniform Decisions of This Court, the Supreme Court of the United States and of the District Courts, All of Which Expressly Refused to Award the Illegal Overcharges to the First Purchaser-Refiner.

*Historical Background of Illegal "Stripper Well" Overcharges*

The validity of the "stripper well" statutes, regulations and interpretations of DOE (and its predecessors) was upheld in a

series of two principal decisions of this Court (TECA) in chronological order as follows: *Energy Reserves Group v. Federal Energy Administration* (TECA 1978) 589 F.2d 1082; and *In re Department of Energy Stripper Well Exemption Litigation* (TECA 1982) 690 F.2d 1375. These cited "stripper well" exemption cases ultimately upheld all statutes, regulations and interpretation of DOE (and its predecessors), relating to the "stripper well" exemption. In the meantime, prior to 1982, over thirty District Courts, including the District Court of the Northern District of Texas in 1977, issued invalid injunctions and interlocutory rulings, permitting the crude oil sellers to wrongfully make illegal overcharges for crude oil wrongfully classified as upper tier "stripper well" oil. Most of these cases, including this case in the District Court of the Northern District of Texas (to which it was later remanded by the Judicial Panel on Multidistrict Litigation [JPML]) were transferred to the District of Kansas by the Judicial Panel on Multidistrict Litigation. In other districts, such as the District of Columbia, the analogous liability for overcharges for lower tier "stripper well" crude oil was enforced by direct enforcement action in the District Court by the DOE in the name of the United States. *United States v. Exxon Corporation* (D.D. C.1983) 561 F.Supp. 816. See § 6.08—The Stripper Well Controversy, in Fox, *Federal Regulation of Energy* (McGraw-Hill 1983), at pages 170–171.

Since decontrol in 1981 every District Court and this Court (TECA) which has reported its decision has properly refused to award the overcharges to the first purchaser-refiner, except the Northern District of Texas in this case.

For example, District Judge Flannery of the District of Columbia after stating the duty of the District Court to do equity and set things right (561 F.Supp. at 855) expressly denied the claim of the first purchaser, stating as quoted above:

> To order a refund to the first purchaser would simply result in a windfall for that purchaser—ironically, in this case

Exxon itself—who would be under no obligation to pass the refund along. 561 F.Supp. at 854.

As a basis for his ultimate action requested by no party, District Judge Flannery noted that in the *Citronelle* case, *supra*, this Court (TECA) approved action "sua sponte" by the District Court in awarding the overcharges for the use of the public. (561 F.Supp. at 854.)

This conclusion was unanimously affirmed by this Court after decontrol in 1985 in *Exxon II, supra*, (TECA 1985) 773 F.2d 1240, cert. denied —— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926. In reaching the quoted denial of award to the first purchaser, District Judge Flannery relied on the cases defining the inherent equitable *duty* and powers to set things right, cited and discussed above in Parts III, IV, VII and VIII hereof. See the conclusions of District Judge Flannery on pages 853 to 856 inclusive of 561 F.Supp. No limitation on this power and this duty by the contentions of DOE (as recognized by the majority in this case) was recognized by District Judge Flannery, who expressly rejected the position of DOE as follows:

> The DOE suggests that, because ultimately all consumers suffered as a result of the overcharges, it would be most appropriate for the court to order payment to the Treasury of the United States, the representative of all citizens.

These conclusions of District Judge Flannery were fully affirmed by the unanimous majority of this Court in *Exxon II, supra* (TECA 1985) 773 F.2d 1240.

In the national multidistrict "stripper well" litigation involving the disposition of "stripper well" illegal overcharges, District Judge Theis of the District of Kansas also expressly denied limitation of payment of the overcharges to the first purchasers stating, as quoted above:

> Having concluded that recovery is not limited to the first purchasers ... the Court must now consider whether it is clearly impossible to ascertain with particularity the parties that bore the bur-

den of the overcharges. 578 F.Supp. at 594.

The District Court of the Northern District of Oklahoma in the unreported *Sutton* case, now affirmed by this Court in (TECA 1986) 795 F.2d 1040, also denied payment to the first purchaser, awarding the overcharges to the public. This judgment of the District Court in the *Sutton* case was noted with apparent approval in the *Exxon II* case, *supra*, (TECA 1985) 773 F.2d 1240 in note 53 at page 1257.

All these cases follow strictly the controlling decisions of the Supreme Court of the United States and of this Court (TECA), cited in Parts III, IV, VII and VIII hereinabove, which are not followed by the majority in this case.

C. The Majority Erred in Applying, in This Illegal Overcharge Case, an Erroneous Inapplicable Rule Based on "Significant Change in Core Circumstances."

In addition to refusal to recognize the duty of the District Court (that issued and maintained for years the invalid injunction under which the illegal overcharges were collected), the majority erroneously approves the application by the District Court of a "significant change of core circumstances" rule drawn by the District Court from the irrelevant decision in *Greater Boston Television Corporation v. FCC (Greater Boston)*, 463 F.2d 268, 283 (D.C.C. 1971), cert. denied 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972).

Somehow, the majority charges the DOE with reliance on this case which was in fact relied on by Cities Service in its brief (Br. for Appellee Cities Service, 10, 12–13, 15, 23). The *Greater Boston* case, *supra*, was properly shown to be inapplicable by DOE in its reply brief (Reply Br. for Defendants-Appellants, 10, 11). But even if DOE relied solely on this case (which it did not as shown hereinabove), the duty of the District Court "to set things right" would not be affected.

Not only has the *Greater Boston* case, *supra*, factually and legally irrelevant be-

cause it did not involve any illegal overcharges of rates or prices, its application was directly contrary to the controlling cases of this Court and the Supreme Court of the United States and of this Court, cited and discussed in Parts III, IV, VII and VIII hereinabove. Many of these controlling cases, ignored by the majority were cited and relied on by DOE in its briefs. (Br. of Defendants-Appellants, 8, 9, 10, 14, 15, 16; Reply Br. 2, 4, 12, 13, 14, 15.)

And as noted by (TECA) Judge Hemphill in the *Citronelle* case, *supra*, by District Judge Flannery in the *Exxon* case, *supra*, 561 F.2d at 854, and District Judge Theis in the *Stripped Well Multidistrict Litigation* case, *supra*, 578 F.Supp. at 594, all cited in Part X A. hereinabove, the District Judge awarding the overcharges had a *duty* to deny the award to the first purchaser (showing no loss), and to set things right, even if the District Court had to act *sua sponte* and contrary to the proposition of DOE.

So it was error for the majority to rely on the irrelevant "significant change in core circumstances" rule in this case. A reading of the *Greater Boston* case, *supra*, will demonstrate that, however well it may have been decided on its facts, it is not applicable in this wrongful injunction and illegal overcharge case.

D. The Majority Erred in Finding as a Fact That the District Court Expressly Exercised a Judicial Discretion in Finding That the Original Remedial Order Should Be Enforced and the Illegal Overcharges Should be Paid to the First Purchaser "To Pocket."

*Preliminary Findings of Fact and Conclusions of Law Holding Injunction of 1977 Invalid*

The first part of the findings of fact and conclusions of law of the District Court leading to the judgment under review were made on October 12, 1982, and are reported under the consolidated case title *Prosper Energy Corporation v. Department of Energy* (D.N.D.Tex.1982), 549 F.Supp. 300,

and quoted above. In essence in this reported Memorandum Opinion, the District Court by summary judgment properly set aside its illegal injunction previously maintained which permitted illegal overcharges, and their accumulation in escrow. The summary judgment holding invalid the injunction, previously maintained for years, followed the mandate of this Court (TECA) which upheld the "stripper well" exemption statute, regulations, and interpretations of DOE. See *In re The Department of Energy Stripper Well Exemption Litigation* (TECA 1982), 690 F.2d 1375. The "fate of the funds currently in escrow was" thereafter reversed by the District Court. 549 F.Supp. at 305.

### Unreported Additional Findings of Fact and Conclusions of Law of July 25, 1983, by the District Court in the Hunt Case Under Review on These Appeals.

Thereafter on July 25, 1983, the District Court made the following unreported findings of fact and conclusions of law, now on review in these appeals, concerning the overcharges in the *Hunt* case (R. 1318–1321 inclusive). These findings of fact and conclusions of law of the District Court are as follows:

### Procedural History

"The plaintiffs in this consolidated action (henceforth Prosper-Hunt) sought a declaratory judgment declaring invalid the Department of Energy's (DOE's) stripper well regulation to the extent that it excluded injection and shut-in wells from the well count in determining eligibility for stripper well classification. In June of 1979, during the pendency of this lawsuit, the court ordered Prosper-Hunt to establish escrow accounts and to pay certain funds, representing alleged overcharges, into said accounts. Through its memorandum opinion of October 12, 1982, this court granted DOE's motion for summary judgment, thereby upheld the regulation and its interpretation by DOE, and *inter alia* concluded that Prosper-Hunt were not entitled to retain the escrowed funds. *Prosper Energy Corp. v. Department of Energy,* 549 F.Supp. 300 (N.D.Tex.1982). The court now has before it the question of what is to be done with these escrowed funds.

### Hunt Overcharges

"During the period January 1, 1974 through December 31, 1974, Hunt overcharged Cities Service Oil Company and several other oil companies on the sale of certain barrels of crude oil and condensate. *In re Estate of H.L. Hunt,* Case No. 6A0C00027, DOE Remedial Order (Nov. 10, 1977) at 6.7. The overcharges resulted from Hunt's improper certification of the 'old domestic' crude oil actually sold as 'stripper well' crude. The DOE issued a notice of probable violation on August 8, 1977, and a remedial order on November 10, 1977. That remedial order directed Hunt to make refunds, with interest, to its initial purchasers of said crude oil.

"Pursuant to § 210 and § 211 of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C. § 1904 note, Hunt brought an action for declaratory and injunctive relief against DOE, seeking a judgment enjoining enforcement of the remedial order in question and declaring DOE's interpretation of its stripper well regulations invalid. In substance, Hunt sought to have this court declare that its certifications of its 1974 crude oil sales as 'stripper well' crude were proper. During the pendency of this suit, the court entered an order requiring Hunt to place into escrow the challenged refunds. Last October, the court granted summary judgment for DOE, thereby upholding the DOE's determinations of overcharges contained in its November, 1977 remedial order. *See generally Prosper Energy Corp. v. Dept. of Energy,* 549 F.Supp. 300 (N.D.Tex.1982).

"Cities Service, intervenor in the remedy phase of this litigation and *de facto* spokesperson for Hunt's initial purchasers, argue that, at this stage of these proceedings, the only avenue open to the court is to order Hunt to comply with DOE's 1977 remedial order and make refund to Hunt's 1974 ini-

tial purchasers. DOE, on the other hand, has requested that the court remand the refund question to it for reconsideration of its 1977 remedial order in light of the decontrol of crude oil prices in 1981. For a variety of reasons, as set forth below, the court believes Cities' position is the better view.

"Initially, the court notes that its review of DOE action in this context is quite limited. § 211 of the ESA is concerned primarily with setting forth a coherent scheme of judicial review of agency actions authorized under the ESA. While not expressly authorizing the institution of actions for declaratory and injunctive relief against such agencies, § 211(d)(1) implicitly recognizes the efficacy of such suits by limiting judicial review of agency action to determining whether such action is either (1) in excess of the agency's authority, (2) arbitrary or capricious, or (3) otherwise unlawful under 5 U.S.C. § 706(2).[1] (1. *See 1971 Congressional & Administrative News, 2294.*)

"The action by Hunt against DOE is not controlled by either § 209 or § 210 of the ESA. Section 209 refers to actions brought by 'person[s] authorized by the President to exercise authority under this title.' Neither the text nor the legislative history of § 209 permits a finding that the section authorizes private actions against the government. On the contrary, it is clear that § 209 was intended solely to create an 'enforcement tool' to be used *by the government. See* 1971 *Cong. & Admn.News* at 2291. Section 210 was intended solely to create a private remedy for violations of the ESA, and thereby, a wholly separate enforcement mechanism. Congress made it clear that, with regard to § 210, *'[t]he Government will not* bring *such action or be the subject of one.'* 1971 *Cong. & Admn.News* at 2291 (emphasis added).

"Accordingly, the present action by Hunt being merely a suit to declare invalid an order of the DOE, and such order having been implicitly held valid, *the court has no authority to do anything other than en-force said order,* so long as the premise for said order is still viable. (Emphasis added.)

"DOE's arguments in support of its motion for remand are simply unconvincing. There has been no argument by DOE in this case that it acted improperly or mistakenly in any respect with regard to its issuance of the 1977 remedial order. The court's memorandum opinion of last October upheld the basis underlying DOE's finding of a violation of its regulations by Hunt. Rather, DOE now contends that changes in circumstances between November, 1977 and the present date justify its reconsideration of that order. More specifically, DOE contends that the decontrol of crude oil prices in 1981 now makes it less likely that any refunds made by Hunt to its initial purchasers will be passed on to consumers. For a number of reasons, this argument must fail. First, the pricing regulations in place in November, 1977 did not mandate that any refunds which would have occurred at that time be passed on to either the recipient's customers or the eventual consumers of refined petroleum products. At least in this respect, there is no difference between the circumstances existing at present and those existing at the time of DOE's issuance of the Hunt remedial order. Second, DOE appears to be basing its 'pass through' argument on the theory that the Hunt overcharges were eventually passed through by Hunt's initial purchasers and others to the ultimate consumers of refined petroleum products. There is simply no evidence in support of such an assertion in the record of the case. But, even if such evidence were present, the 'passing through' of the Hunt overcharges to Cities Service and others would not bar their right to recover the refunds as previously ordered by DOE. *See generally Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 487–94, 88 S.Ct. 2224, 2228–32, 20 L.Ed.2d 1231; *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 736–47, 97 S.Ct. 2061, 2069–75, 52 L.Ed.2d 707 (1977); *Eastern Airlines, Inc. v. Atlantic Richfield,* 609 F.2d 497, 498–99 (Em. App.1979); and *U.S. Oil Co., Inc. v. Koch*

*Refining Co.,* 518 F.Supp. 957, 960–61 (E.D.Wisc.1981).

"It appears that (1) there has been no significant change in the core circumstances surrounding the issuance of the 1977 remedial order, *see Greater Boston Television Corporation v. F.C.C.,* 463 F.2d 268, 283 (D.C.Cir.1971), *cert. denied* 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972); and (2) the justifications set forth by DOE for its reconsideration of its 1977 remedial order are not persuasive in this context. Accordingly, the court will not order remand of the 1977 remedial order to DOE. Rather, the court hereby orders Hunt to comply fully with DOE's remedial order of November 19, 1977, with respect to its miscertifications of stripper well crude oil.

"The court's disposition of the Hunt overcharges above necessarily denies the relief requested by the intervenor States and Territories with regard to those overcharges. The intervening oil companies and their representatives have made no claims against the Hunt overcharges, as said overcharges occurred prior to the institution of DOE's Entitlements Program.

"A judgment will be drawn accordingly. (R. 1317–1321 inclusive.)"

### Final Judgment of District Court in Hunt Case Under Review

On the same day, July 25, 1983, the foregoing findings of fact and conclusions of law were filed and a final judgment, from which these appeals were taken, was entered by the United States District Court for the Northern District of Texas, Dallas Division. In that final judgment (a) the injunction against enforcement of the remedial order of DOE was "lifted in all respects; (b) the stripper well exemption regulation of DOE, as interpreted by Ruling 1974–29 was declared valid in all respects; (c) the escrow agent of the Hunt overcharges was authorized to pay out the funds in the Hunt account to the first purchaser in accordance with the 1977 Remedial Order of DOE in *In re Estate of H.L. Hunt,* insofar as the Executor of the Hunt Estate had not already complied with

the remedial order; (d) that the Executor of the Hunt Estate take nothing, and that the action for injunction and declaratory judgment (previously maintained for years) be dismissed on the merits; (e) that DOE and the Secretary of Energy recover costs from the Executor of the Hunt Estate; and (f) that all relief prayed for by the intervenors *other than Cities Service* be denied. In this final judgment the District Court denied the request by motion that the refund question and the Remedial Order be remanded to DOE.

### Erroneous Rule on "Change in Core Circumstances" Applied by Majority

In their opinion herein the majority erroneously found that in the above quoted memorandum and the judgment of July 25, 1983, "... the district court did not abuse its discretion in finding that DOE failed to sustain its burden of showing a change in core circumstances." (Emphasis added.)

The difficulty with this finding is that the *District Court did not purport to exercise a discretion.* (It would be permissible to retain jurisdiction, and remand the case to permit the district court to make a full record on the issue.) To supplement the non-existence factual record on the issue of exercise of discretion, the majority erroneously adds to the above quotation footnote 7, unsupported by the record, as follows:

We have no doubt that the district court exercised its discretion in finding that DOE failed to show a change in core circumstances. In the unpublished opinion accompanying its order denying remand, the court noted that it was required to enforce the remedial order "so long as the premise for said order is still viable." The court then discussed the "changed circumstances" issue at some length and concluded:

It appears that (1) there has been no significant change in the core circumstances surrounding the issuance of the 1977 remedial order ...; and (2) the justification set forth by DOE for its reconstruction of its 1977 remedial

order are not persuasive in this context. Accordingly, the court will not order remand of the 1977 remedial order to DOE.

This passage clearly demonstrates that the district court considered DOE's arguments in favor of remand and, in an exercise of its discretion, rejected them.

This footnote is an obvious effort to create in the record on appeal the description of a discretion (nonexistent under controlling law), not enunciated, or in fact exercised of record by the District Court.

It is not permissible for an appellate Court to enunciate and approve the assumed exercise of a discretion of a trial court, not appearing of record. *Continental Illinois National Bank & Trust Co. v. C.R.I. & P.R. Co.*, 294 U.S. 648 at 677, 55 S.Ct. 595 at 606, 79 L.Ed. 1110 at 1129; 5 Am.Jur.2d, *Appeal and Error*, 216, 27, § 774, Existence of Discretion; 2 Federal Practice, Lawyers Edition, § 3.379, page 474. Cf. *United States v. Nebbia* (C.A.2 1966), 357 F.2d 303; *LaBuy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed2d 290 (1957); *Western Electric Co v. Stern* (C.A.3 1976) 551 F.2d 1; *Cessna Aircraft Distributorship Antitrust Litigation* (C.A.8 1975) 518 F.2d 213, cert. denied, 423 U.S. 947, 96 S.Ct. 363, 46 L.Ed.2d 282.

It is however permissible to remand the case for exercise of discretion (if it exists) when the District Court has not exercised it or has abused it. See authorities cited immediately above.

## ADDITIONAL PROCEDURAL ERRORS

E. The Majority Erred In Holding That the Burden of Proof Rested On the DOE to Disprove the Contentions of Cities Service.

In part II of its opinion entitled *II Change in Circumstances*, the majority sets forth an inaccurate statement of the contentions of DOE, and then concludes with the following erroneous passage placing a burden of proof (essential to the erroneous result reached by the majority) as follows:

DOE has not attempted to disprove Cities Service's contentions, either before this Court or before the district Court.... As proponent of the remand motion, DOE bears the burden of demonstrating a change in core circumstances.

This erroneous statement is contrary to the express conclusion of District Judge Flannery, at page 854 of 561 F.Supp., affirmed by this Court (TECA) in the *Exxon II* case, *supra* (1985), 773 F.2d 1240; contrary to the conclusion of District Judge Theis in the *Stripper Well Multidistrict Litigation* case, *supra*, 578 F.Supp. at 594; and of Judge Hemphill of TECA in the *Citronelle* case, *supra*, 669 F.2d at 722, among other cases cited in Part X D. hereinabove.

But above all, the erroneous placement of the burden of proof is contrary to the controlling rule of the Supreme Court which held that the burden of damages rested on the first purchasers in the *Interstate Natural Gas* case, *supra*, in which it stated in part, in 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. at 901:

It is the responsibility of the court which distributes the fund accumulated under its stay order to correct that which has been wrongfully done by virtue of its process.... That *responsibility plainly cannot be discharged by payment of the fund to those who show no loss by reason of the court's action.* (Citation omitted; emphasis added.)

The many cases establishing this rule of law concerning proof are cited and analyzed in Parts III, IV, VII and VIII hereinabove.

No applicable controlling case can be cited to support the erroneous placing of the burden of proof (primary or secondary) on DOE. The *Greater Boston* case, *supra,* is obviously inapplicable as shown in Part X B. hereinabove.

The controlling cases cited in support of this dissent essentially hold that the wrongful injunction staying enforcement of a lawful statute and regulation for years created a presumption of injury to the public

or others that cast the burden of proof on the first purchaser to show if possible "loss by the court's action." Among recent cases applying the rule is the *Exxon II* case, *supra,* 773 F.2d 1240, from this Court (TECA) in which this Court affirmed a summary judgment of District Judge Flannery based on facts, judicially noticed, that the first purchaser obviously sustained no less. *Interstate Natural Gas* case, *supra,* 336 U.S. at 581, 69 S.Ct. at 778, 93 L.Ed. at 901.

F.  The Majority of This Court Had No Authority to Express and Adopt Statements and Conclusions to Constitute Reasons For the Exercise of Discretion of the District Court Not Exercised By the Trial Court.

It is a rule of law that an appellate court cannot exercise the power and discretion of a trial court to make a discretionary decision. Here, despite the fact that the District Court disclaimed the power and authority to exercise a judicial discretion, the majority in footnote 7 undertook to enunciate findings and conclusions in support of and in lieu of an exercise of discretion, never exercised by the District Court. In so doing the majority sought to supplement the non-existent record with footnote 7, as follows:

> [7] We have no doubt that the district court exercised its discretion in finding that DOE failed to show a change in core circumstances. In the unpublished opinion accompanying its order denying remand, the court noted that it was required to enforce the remedial order "so long as the premise for said order is still viable." The court then discussed the "changed circumstances" issue at some length and concluded:
>
>> It appears that (1) there has been no significant change in the core circumstances surrounding the issuance of the 1977 remedial order ...; and (2) the justifications set forth by DOE for its reconsideration of its 1977 remedial order are not persuasive in this context. Accordingly, the court will not order remand of the 1977 remedial order to DOE.

This passage clearly demonstrates that the district court considered DOE's arguments in favor of remand and, in an exercise of its discretion, rejected them.

If there was no doubt why was it necessary to create this appellate record, instead of citing the record of the District Court? The answer to this question is obvious. It is that there is nothing in the record of the District Court to support it.

This action of the majority was in conflict with the controlling rule enunciated in *Continental Illinois National Bank & Trust Co. v. C.R.I. & P.R. Co.,* 294 U.S. 648 at 677, 55 S.Ct. 595 at 606, 79 L.Ed. 1110 at 1129, as follows:

> A claim that injurious consequences will result to the pledgee or mortgagee may not, of course, be disregarded by the district court; but it presents a question addressed not to the power of the court but to its discretion—a matter not subject to the interference of an appellate court unless such discretion be improvidently exercised. 2B Supreme Court Digest L.Ed. *Appeal* § 1366 and cases therein cited.

The earlier cases from the Supreme Court of the United States are collected in the 2B Supreme Court Digest, Lawyers Edition, *Appeal and Error* § 1366.

*While it may not exercise the discretion of a trial of a trial judge,* an appellate court may, by reversal or extraordinary writ of mandamus, direct the trial judge to exercise a discretion in a manner he feels justified, if he believes he has no discretion (as in this case) or has abused his discretion. 2 *Federal Procedure L.Ed.* § 3, 379, 474, 475, and cases therein cited including *La Buy v. Howes Leather Co.,* 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 560.

G.  Neither the DOE, or Any Other Party, Had Authority to Limit the Consideration of This Court on Appeal of the Public Interest, or to Limit the Issues on Appeal, as Erroneously Concluded By the Majority.

In its opinion on these appeals the majority erroneously seeks to avoid application

of the controlling cases on the legal and equitable powers and duties of a court, setting aside an invalid injunction against unlawful statutes and regulations, permitting illegal overcharges of the public. The majority states its erroneous position beginning in the final paragraph as follows:

This appeal presents a narrow issue whether the district court abused its discretion in holding that the Department of Energy (DOE) failed to demonstrate a change in core circumstances requiring remand of a lawful remedial order to the agency for reconsideration.

In Part I of the majority opinion, paragraph 3 in the first sentence, the same error is repeated as follows:

This Court's review of the district court's order is limited.

Aside from the fact that the District Court never claimed to have exercised a judicial discretion as pointed out in paragraph X A. hereof, no reason is given by the majority for the assumption of a "narrow issue," or the conclusion that the review by this Court is "limited." The statements are contrary to all controlling decisions cited and discussed in Parts III, IV, VII and VIII hereof.

But assuming that the DOE and the parties to this appeal expressly undertook to narrow and limit the issue, none of them had any authority to do so. This is a general rule that the public interest is not subject to estoppel by the federal government, DOE or anyone else. The law and reason for the rule are stated in the Annotation, *Estoppel Against Federal Government*, 27 A.L.R. Fed. 702 at pages 711 to 713. See the collection of authorities and discussion in Part II A § 83 of this Annotation, *supra*, concerning lack of authority to create estoppel against the public interest. This principle was expressly applied by Judge Flannery in *United States v. Exxon Corp.* (D.C.1983) 561 F.Supp. 816 at 847, 848, and unanimously approved by this Court (TECA 1985) in *Exxon II, supra*, 773 F.2d 1240.

So the supposed failure to assert the public interest (fully asserted in the briefs in this appeal by DOE and by the Intervenor-Appellants, States of Arkansas, et al.) could not constitute a limitation or narrowing of the issues, to preclude the public interest, and the existence of the equitable powers and duty of the District Court in setting aside an invalid injunction.

H. The Majority Erred In Erroneously Finding In Paragraph 1 That "We Are Not Asked to Determine the Court's Power or Duty to Fashion a Restitutionary Remedy."

This finding is erroneous because:

(1) The power and *duty* of the District Court, as a court of equity which issues a wrongful injunction are clear. The District Court, in these circumstances, had the inherent power and *duty* under the decisions of the Supreme Court of the United States and of this Court (TECA) to do equity to those damaged by the invalid injunction, and the illegal overcharges made thereunder.

(2) The DOE and other parties in the District Court and in their briefs in this Court sought disgorgement of the illegal overcharges and equitable payment of the overcharges in escrow.

1. *Inherent Equitable Duty and Power to Order Restitution*

The decisions of the Supreme Court of the United States, followed scrupulously by this Court (TECA), established beyond doubt that the inherent equitable *duty* and power to make restitution of illegal overcharges made pursuant to a wrongful injunction as in this case. *Porter v. Warner Holding Company (Warner Holding)*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); *Public Service Commission of Missouri v. Brashear Freight Lines (Brashear Freight)*, 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941); *Federal Power Commission v. Interstate Natural Gas Company (Interstate Natural Gas)*, 336 U.S. 577, 69 S.Ct. 775, 93 L.Ed. 895 (1949); *Mitchell v. De Mario Jewelry*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960),

affirming the *Warner Holding* case, *supra.*

In *Porter v. Warner Holding Company (Warner Holding), supra,* 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946), the duty and power of a federal court under the Emergency Price Control Act of 1942 (Act), 50 U.S.C. § 925(a), to order restitution of rents collected in excess of legally permissible ceiling rates were defined and enforced by the Supreme Court. In that case, the District Court had enjoined the defendant landlord from collecting excess rents, but declined to order restitution, holding there was no jurisdiction to do so under the Act. The Eighth Circuit Court of Appeals affirmed the judgment of the District Court.

The Supreme Court reversed the judgment of the District Court finding that the Administrator of the Office of Price Administration had invoked the equitable jurisdiction of the District Court by seeking an injunction to enforce the rent ceiling. The Supreme Court then held that the District Court had the broad inherent equitable duty and power to do what justice required, stating:

Unless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction. *And since the public interest is involved in a proceeding of this nature, those equitable powers assume an even broader and more flexible character than when only a private controversy is at stake. Virginian R. Co. v. System Federation, R.E.D.* 300 US 515, 552, 81 L ed 789, 802, 57 S Ct 592 [601]. Power is thereby resident in the District Court, in exercising this jurisdiction, 'to do equity and mould each decree to the necessities of the particular case.' *Hecht Co. v. Bowles,* 321 US 321, 329, 88 L ed 754, 760, 64 S Ct 587 [591]. It may act so as to adjust and reconcile competing claims and so as to accord full justice to all the real parties in interest; if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice. *Camp v. Boyd,* 229 US 530, 551, 552, 57 L ed 1317, 1326, 1327, 33 S Ct 785 [793]. (Emphasis added.)

Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. 'The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.' *Brown v. Swan,* 10 Pet. (US) 497, 503, 9 L ed 508, 511. See also *Hecht Co. v. Bowles, supra,* (321 US 330, 88 L ed 761, 64 S Ct 587). *Warner Holding,* 328 U.S. at 398, 66 S.Ct. at 1089, 90 L.Ed. at 1336, 1337.

In *Public Service Commission of Missouri v. Brashear Freight Lines (Brasher Freight),* 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083 (1941), many common carriers secured in a District Court an invalid regulatory statute of Missouri imposing taxes and license fees on motor carriers operating in interstate commerce. The Supreme Court held that the District Court had the duty and power to assess damages including costs of litigation, taxes and fees, caused by the improperly granted injunction, under which the challenged taxes and license fees had been deposited in escrow, stating:

Under long settled equity practice, courts of chancery have discretionary power to assess damages sustained by parties who have been injured because of an injunctive restraint ultimately de-

termined to have been improperly granted. *Russell v. Farley*, 105 U.S. [15 Otto], 433, 44 et seq., 26 L ed 1060, 1064; *Pease v. Rathbun-Jones Engineering Co.*, 243 US 273, 279, 61 L ed 715, 721, 37 S Ct 283 [286], Ann Cas 1918C 1147. *Brashear Freight*, 312 U.S. at 629, 61 S.Ct. at 788, 85 L.Ed. at 1088.

In *Brashear Freight, supra*, the Eighth Circuit Court of Appeals had failed to recognize and enforce the duty and power of the District Court to make restitution, despite the deposit in escrow or trust of the challenged taxes and license fees under the protection of the improperly issued injunction against enforcement of the regulatory statute of Missouri.

In 1960, the Supreme Court of the United States in *Mitchell v. De Mario Jewelry (De Mario Jewelry)*, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960), expressly affirmed *Warner Holding, supra*, 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). In *De Mario Jewelry, supra*, the Supreme Court quoted the language of *Warner Holding, supra*, stating that a court in equity may give whatever relief is necessary, and then stated:

The applicability of this principle is not to be denied, either because the Court there [*Porter v. Warner Holding Co.*] considered a wartime statute, or because, having set forth the governing inquiry, it went on to find in the language of the statute affirmative confirmation of the power to order reimbursement. Id. 328 U.S. at 399 [66 S.Ct. at 1089]. When Congress entrusts to an equity court the enforcement of prohibitions contained in a regulatory enactment, *it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes. De Mario Jewelry*, 361 U.S. at 291, 292, 80 S.Ct. at 335, 4 L.Ed.2d at 326 (emphasis added).

The cases from this Court following this principle include the *Exxon II* case, *supra* (TECA 1985), 773 F.2d 1240, cert. denied,

— U.S. ——, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), affirming the District Court in 561 F.Supp. 816 (1983); *Citronelle-Mobile Gathering Co. Inc. v. Edwards (Citronelle)*, 669 F.2d 717 and *Sauder v. Department of Energy* (TECA 1981), 648 F.2d 1341, which are cited and analyzed with quotations in Part II above.

### 2. *Many requests for Enforcement of Duty of Restitution by the Parties*

By seeking remand of the remedial orders suspended for years, DOE offered to assist the District Court in discharge of its duty, an offer accepted by the District Court in the once consolidated and now parallel stripper well exemption litigation by the District Court of Kansas in *In re Stripper Well Exemption Multidistrict Litigation* (D.Kan.1983), 578 F.Supp. 586.

Further the briefs of *DOE*, and the *Intervenor-Appellant States of Arkansas et al.* are replete with requests to this Court (TECA) to enforce the duty of the District Court to order equitable restitution (rather than the "truncated justice" forbidden expressly by this Court in the *Citronelle* case, *supra*, at page 722 of 669 F.2d).

The pages of the briefs in this Court seeking enforcement of the inherent equitable *duty* and power to order restitution are as follows.

### *Contentions Raising Issue of Restitution in Briefs of Appellant DOE and Intervenor Appellants*

The Appellants DOE (et al.) and Intervenor Appellants, States of Arkansas (et al.) made many clear express contentions based on the issue of the duty and right of the District Court to order equitable restitution, by making "victims whole" in awarding illegal overcharges, made for years under protection of an invalid injunction of the District Court. Some of these contentions and the pages of the briefs on which they appear are summarized as follows:

1. *Briefs of Defendant-Appellants DOE, et al.*

In the *SUMMARY OF ARGUMENT* in its brief (8–10 inclusive), DOE stated its claim for restitution (by administrative remand) as follows:

> The reason for such a remand is simple. As the Court has previously recognized, one of the purposes of restitution is "to make the victims whole ..." and restored to a position where they would have been had it not been for the overcharges. *Citronelle-Mobile Gathering Inc. v. Edwards*, 619 [669] F.2d 717, 722 (TECA 1982), cert. denied 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). The actual victim of Hunt's overcharges was not necessarily Cities, the first purchaser. Because the price regulations contained cost pass-through provisions applicable to each level of distribution in the petroleum industry, the regulations permitted the unlawfully high crude oil overcharges to be passed through by the refiner to product resellers and retailers and ultimately to the consumer.... Decontrol of petroleum and petroleum product prices in January 1981 eliminated the regulatory mechanism previously awarded to "insure that restitution to the first purchaser-refiner would be passed along to the ultimate consumer *Grigsby v. DOE*, 561 F.Supp. at 54. Accord *United States v. Exxon Corp.*, 561 F.Supp. 816, 854 (D.D.C.1983) appeal docketed No. DC 91 et al. (TECA July 7, 1983).

This contention of duty and right to *restitution* in the District Court, featured administrative action among other remedies and was repeated and expanded by DOE in its original brief on pages 11, 12: "The District Court was thus in error in holding that it lacked authority to do anything other than enforce the remedial orders." On page 14, DOE stated: "This blindly paying the overcharges to the first-purchaser-refiner undercuts the purpose of *restitution,* which this Court has stressed is 'to make victims whole ...' and restored to a position where they would not have been for "the overcharges, since it gives the first

purchaser a windfall while leaving the injured parties unrecompensed." (Emphasis added.)

The brief of DOE supported the claim of restitution by citing the *Citronelle* case, at page 15; by citing the passage of restitution from *Olympia Exploration Co. v. DOE*, 4 Energy Management (CCH) at 26,-773, at page 16; by quoting the passage on restitution from *In Re Department of Energy Stripper Well Exemption Litigation* (D.Kan.), 578 F.Supp. 586.

The contention that it was the duty of District Court to order restitution was repeated again and again by DOE in its original brief at pages 18, 20, 21. In its Reply Brief, DOE emphasizes its contentions based on the duty and power of the District Court to order restitution at pages 2, 4, 9, 12 (note 10), 13 (citing *FPC v. Interstate Gas, supra,* 336 U.S. at page 582), 14, 15, and 16. It is true that DOE preferred an administrative order of restitution but it clearly asserted the power and duty of the District Court to order restitution, and the erroneous failure to do so.

2. *Briefs of Intervenor-Appellants States of Arkansas, et al.*

In their original brief and reply brief the Intervenor-Appellants States emphasized their contentions that the District Court erred in failing to order restitution, and in denying its authority to do so. In their *SUMMARY OF ARGUMENT* at pages 8–10 in the original brief these intervenor-appellants made this clear stating:

> The reason for such a remand is simple. As this Court has previously recognized, one of the purposes of *restitution* is "to make the victims whole ... 'and restored to a position where they would not have been had it not have been for'" the overcharges. *Citronelle-Mobile Gathering Inc. v. Edwards*, 669 F.2d 717 (TECA 1982), cert. denied 459 U.S. 877, 103 S.Ct. 172, 74 L.Ed.2d 141 (1982). The actual victim of Hunt's overcharges was not necessarily Cities, the first purchaser. (Emphasis added.)

This contention based on the legal duty and power of the District Court to order restitution is repeated again and again in the original brief and reply brief of these intervenor appellants as follows. In the original brief of Intervenor-Appellants States the contention appears at pages 12, 13, 14, 16, 18, 19, 20 and 21. In their reply brief, the Intervenors-Appellants States emphasize the duty and power to make restitution at pages 2, 5, 6 and 7, including footnotes.

This summary does not include the review of the briefs of the four Amicus (sic) Curiae, supportive, emphatic and clearly based on the issue of restitution raised by the appellants, as summarized above.

## CONCLUSION

The judgment of the District Court should be reversed for further proceedings consistent with the foregoing opinion.